**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SONJA PERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11 C 00439** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Sonja Perry, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and 1382c(a)(3)(A). Ms. Perry asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks summary judgment affirming the decision.

### I.
### PROCEDURAL HISTORY

Ms. Perry applied for DIB and SSI on August 10, 2007, alleging an onset date of July 14, 2004 due to fibromyalgia, head, back, and neck injury. (Administrative Record ("R.") 147). Additionally, Ms. Perry filed concurrent disability claims on September 8, 2006 for a Period of Disability and Disability Insurance (Title II) benefits and for SSI payments. (R. 26). Because she filed her current claims less than two years after the initial adverse determination on her 2006 application, the current applications are considered to be an implied request to reopen the 2006 applications. Her current claims

were initially denied on January 15, 2008, and upon reconsideration on April 4, 2008. (R. 26). Thereafter, Ms. Perry filed a written request for a hearing on Mary 23, 2008. (R. 26).

An administrative law judge ("ALJ") held a hearing on February 4, 2010, at which Ms. Perry, represented by counsel, appeared and testified. (R. 52-134). At this hearing, Lee O. Knutson, testified as a vocational expert. (R. 85-89). On February 17, 2010, the ALJ issued an unfavorable decision, denying Ms. Perry's application for DIB and SSI. (R. 26-47). Ms. Perry then filed a timely appeal on September 27, 2010, and requested review by the Appeals Council, which was denied on November 19, 2010. (R. 1-8). Ms. Perry has appealed that decision to this Court. This Court has jurisdiction per 42 U.S.C. § 405(g) and 1383(c).

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Ms. Perry was born on December 24, 1969, making her forty years old at the time of the ALJ's decision (R. 62). She lived with her sister and her family. *Id.* She attended Englewood High School through 10th grade, and has been working towards gaining her GED. (R. 68). Ms. Perry previously worked as a school bus driver until an accident in 2004. (R. 74). She held this position for approximately five years, and worked a split-shift during that time. *Id.* Prior to that, she was a cashier/cook and a lunch room supervisor at a school. (R. 243).

**B.**
**The Medical Evidence**

Ms. Perry originally suffered injuries on July 14, 2004 when she was involved in an accident with another vehicle while working as a school bus driver. (R. 75-76). As a result, she suffers pain in her head, neck, shoulders, and back. *See* Plaintiff's Memorandum in Support of Her Motion for Summary Judgment at 2. ("Plaintiff's Memorandum"). Additionally, Ms. Perry claims that she has suffered symptoms of major depression, memory loss, and a panic disorder. (R. 60, 78-80). Ms. Perry also suggests that the combination of chronic pain in her head, back, neck, and other extremities has led to a diagnosis of fibromyalgia. *Id.* She claims that both her mental and physical impairments have not allowed her to work since her accident in 2004. (R. 242).

On the date of the accident, Ms. Perry's medical assessment from Advocate Trinity Hospital noted pain to her head, neck, shoulders and back. (R. 366). A CT scan showed the existence of an approximately 3 x 2 x 2 cm. low attenuation extra-axial mass-like lesion. (R. 335). The report further noted that the lesion appeared to potentially be an arachnoid cyst, and recommended a further MRI of the brain. *Id.* A chest x-ray revealed no acute cardiopulmonary findings. (R. 336). An x-ray of Ms. Perry's cervical spine showed no definitive acute bony abnormality. (R. 337). An x-ray of her lower back and lumbar spine also showed no definitive acute bony abnormality. (R. 338). Additionally, the emergency room medical report explained that Ms. Perry showed no neurological deficits, but that she did have a slow and steady gait and was experiencing a pain at the level of 8/10. (R. 366). The report also suggested that Ms. Perry consult with Dr. S. Ahmed or Ms. Perry's personal physician with copies of her CT scan in 1-7 days.

3

(R. 367).

After Ms. Perry's discharge from Advocate Trinity Hospital, she returned to the hospital on September 10, 2004, complaining of pain, a sense of tingling and numbness, and a headache. (R. 373). She underwent a CT scan, which, according to Dr. Richard Bauer's report, showed a lesion. (R. 364, 369). Dr. Bauer suggested that an MRI of the brain be done. *Id.*

On August 19, 2005, Ms. Perry once again returned to the emergency room at Advocate Trinity Hospital complaining of abdominal pain and vomiting. (R. 316). She was diagnosed with acute abdominal pain and potential acute gastritis and told to consult with her primary care physician. (R. 320). On December 30, 2005, Dr. Kenneth Lapat performed a Venous Doppler exam of Ms. Perry's left leg, finding no evidence of deep vein thrombosis, but he suggested an ultrasound of the area if the symptoms persisted. (R. 333).

In addition to Ms. Perry's visits to Advocate Trinity Hospital, she underwent an audiology evaluation on November 10, 2005, performed by audiologist Nancy Hamilton at Mt. Sinai Hospital. (R. 340). Ms. Hamilton found that Ms. Perry had moderate/severe sensorineural hearing loss bilaterally. *Id.* Additionally, Ms. Perry was under the care of Dr. Herman Morgan for panic attacks that were not controlled by "SSRI's, beta-blockers, and antianxiolitic agents. (R. 357). According to Dr. Morgan's notes, Mr. Perry reported feeling nervous during a consultation on May 25, 2006. (R. 363). On September 9, 2006, Dr. Morgan noted that Ms. Perry still felt extremely nervous and was experiencing persistent headaches. ®. 362). In a letter dated September 7, 2007 to the Illinois Department of Human Services, Office of Rehab Services – Disability Determination,

4

Dr. Morgan wrote that Ms. Perry has a history of panic disorder and migraine headaches that had not been cured by treatment. (R. 448). Additionally, Dr. Morgan noted that Ms. Perry's medications as of her last visit on April 3, 2007 were Alprazolam, Paxil, and Depakote. *Id.*

On August 11, Ms. Perry returned to Trinity Hospital complaining of pain and swelling in her left ankle that radiated up to her thigh. (R. 300). After her ankle and leg were examined, Ms. Perry was discharged and told to return if her condition does not get better or worsens. (300-01). Ms. Perry also sought treatment at the Garfield Damen clinic with Dr. Oladeinde from July 2006 until November 2006. (R. 341-49). The records from these visits show that Ms. Perry reported the recent sprain to her right ankle during her visit on July 16, 2006, as well as a complaint of depression. (R. 347). Dr. Oladeinde instructed Ms. Perry to undergo an MRI and prescribed Vicodin for her ankle pain. The MRI of Ms. Perry's ankle, taken on July 17, 2006, showed swelling and mild degenerative changes. (R. 354). Ms. Perry then returned to Dr. Oladeinde on July 20, 2006, complaining of continuing ankle pain; Dr. Oladeinde suggested she begin physical therapy. (R. 346).

On August 11, 2006, Ms. Perry was back at Dr. Oladeinde's office complaining of pain and swelling in her left leg. (R. 345). Due to Dr. Oladeinde's concern that Ms. Perry may have developed deep venous thrombophlebitis ("DVT"), Dr. Oladeinde ordered Ms. Perry to go to the E.R. at Trinity Hospital. *Id.* After a CT study of her left leg at Trinity Hospital, DVT was ruled out. (R. 298-300). Ms. Perry then had a follow-up visit with Dr. Oladeinde on August 17th complaining that her left leg was still swollen, which prompted the doctor to refer Ms. Perry for another ultrasound. (R. 344).

5

Additionally, Dr. Oladeinde reviewed the MRI taken of Ms. Perry's brain, noted the arachnoid cyst, and ordered another MRI to be performed. *Id.* That MRI, performed on September 6, 2006, showed no abnormal enhancement, but the presence of mild sinus disease. (R. 351). Dr. Oladeinde treated Ms. Perry for her complaints of sinus problems and headaches on September 12, 2006. (R. 343).

On December 14, 2006, Ms. Perry met with Dr. Peter Biale for an Internal Medicine Consultative Examination for the Bureau of Disability Determination Services. (R. 433-37). Dr. Biale's report noted the following problems: rheumatoid arthritis, painful hands, low back pain, neck pain, hearing loss, migraine headaches, bronchitis, and depression. (R. 436). In addition to the medical examination on December 14, 2006, Ms. Perry also met with Dr. John O'Donnell who performed a Psychiatric Evaluation. (R. 438-45). In his report, Dr. O'Donnell noted several findings in his diagnosis, including: panic disorder with agoraphobia, depressive disorder, a history of post-traumatic stress disorder, a history of cognitive disorder, and personality disorder. (R. 444).

On May 18, 2007, Dr. Linda Mileti, a rheumatologist at The University of Chicago Hospital, examined Ms. Perry. (R. 400-01). Dr. Mileti noted that Ms. Perry was tender throughout both the joints and soft tissue diffusely, that she had a full range of motion, muscle strength of 5/5 on the left side, and decreased muscle strength on the right side. *Id.* Additionally, Dr. Mileti noted that Ms. Perry was a 3+ to 4- in the proximal and distal muscle groups of both the upper and lower extremities on the right. (R. 401). Dr. Mileti concluded that she likely had fibromyalgia and probable obstructive sleep apnea. *Id.* Dr. Mileti examined Ms. Perry again on June 29, 2007, and noted that Ms. Perry experienced 18/18 tender points, but no evidence of diffuse connective tissue

disease. (R. 403-04). Further, Dr. Mileti stated that Ms. Perry's pain likely stemmed from obstructive sleep apnea. *Id.* He also noted that Ms. Perry was scheduled to undergo a sleep study in August of 2007. *Id.*

On May 26, 2007, Ms. Perry underwent an MRI at The University of Chicago Hospital performed by Dr. Richard Keating. (R. 416). Dr. Keating noted that Ms. Perry complained of hearing loss and left leg weakness. *Id.* MRI examination was normal with no signs of hemorrhage, mass, edema, or other abnormalities. *Id.*

On June 8, 2007, Dr. Shalini Chawla performed a psychiatric evaluation. (R. 452-56). Dr. Chawla noted that Ms. Perry presented symptoms of depression and anxiety that stemmed from the accident in 2004. (R. 455). Dr. Chawla also found that Ms. Perry had multiple neurovegetative symptoms of depression including hopelessness, helplessness, low energy, anhedonia, and decreased concentration as well as appetite and sleep, and somatic pain symptoms. *Id.* Dr. Chawla noted that Ms. Perry had symptoms of panic attacks with agoraphobia and claustrophobia. *Id.* He found she had a biological predisposition for psychiatric illness and psychosocial stressors such as unemployment, poor coping skills in response to her illness, lack of family support, and her status as a single mother. *Id.* Dr. Chawla recommended that Ms. Perry partake in psychotherapy to address these stressors. (R. 456).

On December 4, 2007, Dr. Helena Radomska performed a psychiatric evaluation on Ms. Perry specifically for the Bureau of Disability Determination Services. (R. 464-68). According to Dr. Radomska's report, Ms. Perry suffered from panic disorder with agoraphobia. (R. 467). The doctor noted Ms. Perry's complaints of neck and shoulder pain as well her fibromyalgia. *Id.* In regard to the stressors in Ms. Perry's life, Dr.

Radomska highlighted the fact that Ms. Perry's medication provided little improvement with her mood swings and sleep. *Id.* Although Ms. Perry did not appear suicidal, she voiced complaints about her severe pain. *Id.* Dr. Radomska assigned Ms. Perry received a Global Assessment of Functioning ("GAF") score of a 45.[1] *Id.*

That same day, Ms. Perry saw Myrlie Casco for an Internal Medicine Consultative Examination for the Bureau of Disability Determination Services. (R. 469-73). Dr. Casco noted no major ailments or impairments, but did state that Ms. Perry was uncooperative due to complaints of body aches. *Id.*

On December 18, 2007, Dr. Towfig Arjmand performed a Physical Residual Functional Capacity Assessment ("RFC"). (R. 493-500). Dr. Arjmand noted that Ms. Perry should never climb ropes, but that she could climb ladders and scaffolds occasionally. (R. 495). Dr. Arjmand also noted Ms. Perry's history of chronic bronchitis, and found she could not be exposed to concentrated pulmonary irritants. (R. 497).

On January 8, 2008, Ms. Perry underwent a Mental Residual Functional Capacity Assessment and another psychiatric review with Dr. Carl Hermsmeyer. (R. 501-03; 479-92). In his report, Dr. Hermsmeyer noted that Ms. Perry suffered from adjustment disorder with depressed mood. (R. 482). Dr. Hermsmeyer commented that Ms. Perry showed signs of panic disorder without agoraphobia. (R. 484). He concluded that Ms. Perry had a panic disorder without agoraphobia and an adjustment disorder with depressed mood. (R. 491). Dr. Hermsmeyer further noted that the severity of Ms. Perry's ailments did not meet or equal any mental listing, but are more than non-severe. *Id.*

---

[1] A Global Assessment of Functioning ("GAF") score of 45 indicates serious symptoms or serious impairment of functioning.

Additionally, Dr. Hermsmeyer explained that although Ms. Perry may have problems with understanding, remembering, and the ability to carry out detailed instructions, she retains the mental capacity to perform simple one and two-step tasks at a consistent pace. *Id.*

An Illinois Request for Medical Advice form was completed by Dr. John Tomassetti and Dr. Ernst Bone, on March 27 and 28, 2008. (R. 505-07). This report noted that Ms. Perry was capable of performing light, unskilled work with the occasional climbing of ramps and stairs. (R. 507). Additionally, it noted that Ms. Perry should avoid exposure to pulmonary irritants. *Id.*

## C.
## The Administrative Hearing Testimony

### 1.
### Ms. Perry's Testimony

Ms. Perry testified that she has lived with her sister, brother-in-law, and niece at her sister's house, and has resided there for approximately the last four years. (R. 62). She stated that she had two children ages 21 and 18 and three grandchildren ages 4, 5, and 1. (R. 63). She noted that her younger son now stays with his father because he is sick. (R. 63-64). She explained that she did not have a current source of income, and that she gets by with the assistance of friends and family. (R. 64). She also received payment from a previous Worker's Compensation Case after her bus accident in 2004. (R. 64-65). She believed that she had received $12,000 in the settlement of the case. (R. 65).

Ms. Perry said she attended Englewood High School until 10th grade and that she was attempting to attain her GED. (R. 68). She testified that she could read and do some arithmetic. (R. 70). In response to the ALJ's hypothetical about figuring out the correct

amount of change that would be received from a five-dollar bill, Ms. Perry said that she thought she would be able to do it. *Id.* Additionally, Ms. Perry stated that she currently has a driver's license, but it may be revoked because she owes $8,421 in child support. (R. 70-71). She explained that she once had a special license for driving the school bus, but that she no longer does. (R. 72-73).

Ms. Perry testified that she has previously lost weight because of stress, depression, and fatigue. (R. 73-74). She explained that she worked as a bus driver for approximately four to five years, and she stopped once she got into an accident. (R. 74-75).

Ms. Perry noted that she has had problems with her memory for some years, and that the bus accident made it worse. (R. 76-78). She testified that she sometimes has difficulty recognizing family members, and remembering where she lives. (R. 78). Additionally, Ms. Perry explained that she sometimes gets lost in her neighborhood. (R. 78-79). While she does not have a car, she does drive about two or three times per week to pick up her niece in Harvey. (R. 82). Sometimes she volunteered at a church food pantry. (R. 83-84).

In response to the ALJ's question of whether or not she could work, Ms. Perry claimed that she was under a lot of stress. (R. 89-90). Ms. Perry further testified that her stress makes it difficult for her to sleep at night. (R. 90-91). Additionally, Ms. Perry stated that she suffers from fatigue, depression, her nerves are bad, and she has a ringing in her ears. (R. 92). She worries about money, her children, and her grandchildren. (R. 93). In order to relax her nerves, Ms. Perry states that she smokes approximately six cigarettes a day. *Id.*

Ms. Perry testified that she feels fatigued mainly due to her lack of sleep that stems from her worrying. (R. 95-96). She hears ringing in both of her ears, but mainly the left one. (R. 96). She previously had a hearing aid for her left ear, but she lost it. (R. 97). When questioned about why she had not returned to a doctor for her ear problem since 2005, Ms. Perry stated that she thought the condition would go away. (R. 97).

The last time Ms. Perry saw a doctor was at the E.R. at Stroger. (R. 98). Ms. Perry testified that she was in a major amount of pain and after the doctors performed some tests she was told to take pain medication. *Id.* When asked why she did not seek out medical attention from 2007 until April 2009, Ms. Perry replied that she thought she could treat it on her own by trying to relax and use over-the-counter- medication. (R. 99). Additionally, Ms. Perry stated that she did not return to her psychiatrist because her medical card had been stopped. *Id.* Further, although she attempted to make an appointment with a doctor at Stroger, her messages went unreturned. *Id.*

When the ALJ questioned Ms. Perry about how long she was going to continue to try her own treatment before seeking out medical assistance, Ms. Perry noted that she had recently thought about going to a doctor. (R. 101-02). Ms. Perry also noted that her sister and brother-in-law think that she should contact a doctor for assistance with her ailments. (R. 102). Ms. Perry said it is difficult to take public transportation, but she admitted that her niece may let her use her car while she is at work. (R. 104).

Ms. Perry explained that she has difficulty sleeping due to the pain. *Id.* She had pain "above my waist, below my waist…my back. My head, my hips, knees, shoulders, elbows," and that these body parts hurt all at the same time. (R. 105). Ms. Perry also noted that she thought her pain stemmed from her fibromyalgia. *Id.* When asked by the

ALJ about whether the pain is always there or if it comes and goes, Ms. Perry responded that the pain is present about ninety to ninety-five percent of the time. (R. 106). In response to the ALJ's questions about what types of pain medication Ms. Perry took, she stated that she usually takes over-the-counter medication, but was once prescribed Vicodin. (R. 107). Ms. Perry further testified that although she takes four to six tablets of either 1600 or 800 milligram pain relievers about three times per day, it only lessens her pain slightly. (R. 107-08).

When asked about her use of a cane, Ms. Perry explained that she got it from a friend's mother, and that she uses it because she loses her balance when she walks. (R. 108). Ms. Perry further testified that she uses the cane both inside and outside the home, and that she likely could not walk a distance of five feet without the assistance of her cane. (R. 109). When questioned about the reason for her bad balance, Ms. Perry explained that she thought it was due to her fibromyalgia. (R. 110). Ms. Perry also noted that she had fallen two times in the past due to her lack of balance. *Id.*

When asked about how she spends her days, Ms. Perry noted that she usually wakes up around 3:00 A.M. and watches television for approximately an hour or so. (R. 112). Ms. Perry also testified that she will read the newspaper and listen to the radio, as well as occasionally help her niece with her homework. (R. 113). While her sister and brother-in-law are at work and her niece is at school, she is home alone. (R. 113-14). Her sister cooks dinner, and usually Ms. Perry does not eat breakfast or lunch. (R. 114). Ms. Perry also explained that although she does not help with chores, she does do her own laundry and occasionally washes the dishes. *Id.*

Ms. Perry stated that due to the amount of pain she is in, she does not like doing

anything. (R. 116). When questioned further, Ms. Perry testified that she does enjoy reading newspapers, but she does not like to go out to movies, clubs, or restaurants due to the pain. (R. 116-17). Ms. Perry also stated that she has a boyfriend who she speaks to on the phone, but that she only sees him every few months. (R. 117-18). Ms. Perry testified that she does not use her brother-in-law's computer often because it is "always crashing." (R. 118). When she does use the computer, she uses it to play games and read emails, but she does not respond to these emails. (R. 119).

When asked about her lifting capabilities, Ms. Perry noted that she could lift books, but not a gallon of milk because she feels sharp pains in her hands and fingers. (R. 120). Ms. Perry further testified that the pain only subsides when she is asleep. (R. 121). Ms. Perry also noted that the longest period of time that she could stand would be about a minute or two before the pain became too unbearable. *Id.* Additionally, Ms. Perry explained that she can sit for about twenty to twenty-five minutes before she needs to lie down. (R. 122).

Ms. Perry's said that she can feed herself, but that she sometimes needs help with bathing and putting on her socks and shoes. (R. 123). Additionally, Ms. Perry testified that she receives assistance in doing her hair as well. (R. 124).

Ms. Perry explained that although she has a medical card, she has not sought medical attention from a doctor. *Id.* She said they told her she would have to get another card. (R. 126).

**2.**
**The Vocational Expert's Testimony**

Mr. Lee Knutson, a certified rehabilitation counselor testified as a vocational expert. (R. 85-89). He recounted Ms. Perry's work experience over the past fifteen years as a school bus driver and explained that it was medium, semiskilled (SVP:4) work. (R. 86). He noted that Ms. Perry's previous work as a lunchroom monitor would be categorized as light and semiskilled (SVP: 3). *Id.* The ALJ asked whether there were any jobs in the regional economy for a person who could perform light work, limited to simple, repetitive, unskilled tasks, without constant pushing and pulling against resistance with the lower extremities, without climbing ladders or scaffolds and only occasionally climbing ramps or stairs, stooping kneeling, or crawling, without exposure to unguarded heights or hazardous equipment. (R. 87). Mr. Knutson said there were about 40,000: approximately 19,600 unskilled, simple assembler positions, 17,400 positions for unskilled hand packagers and packers, and 6,700 inspectors, checkers, and weighers. (R. 88).

In regard to positions available at the sedentary level, Mr. Knutson testified that there are approximately 3,300 bench and sedentary bench assemblers, as well as 2,000 sedentary packers, and approximately 800 checkers, weighers, and inspectors. (R. 88). Mr. Knutson also stated that such workers are expected to be productive about 85-90% of the time. *Id.* Mr. Knutson explained that the jobs he previously referenced would not require any interaction with the general public, and having to walk with a cane would have no impact. Mr. Knutson further noted that these jobs would be considered production-type jobs and would only include superficial

14

involvement with coworkers, but that they would require the employees to follow work procedures and to accept instruction and supervision. (R. 88-89).

Mr. Knutson testified that absences from attendance for such jobs would be allowable no more than 10% of the time. (R. 89). In response to the ALJ's question about the consequences of a worker who becomes frequently distracted and is non-productive, Mr. Knutson stated that such a person would not be employable in any of the positions previously mentioned. *Id.*

### III.
### THE ALJ'S DECISION

The ALJ concluded that the claimant has not been under a disability within the meaning of the Social Security Act from July 14, 2004, through the date of the decision. (R. 26). After reviewing the medical evidence, the ALJ began by stating that the record did not establish that Ms. Perry suffers or previously suffered from a medically determinable severe physical or mental impairment that has lasted for a consecutive 12-months or longer during the relevant time; *i.e.*, she did not have a severe impairment. (R. 29). The ALJ specifically relied on Ms. Perry's acknowledgment that she has not had or sought treatment for any physical or mental impairments since mid-2007, with the exception of a visit to Stroger Hospital in April, 2009. *Id.* In response to this, the ALJ stated that although Ms. Perry has complained of multiple symptoms and subjective limitations, she did not show the type of pathology or anatomical abnormalities that would be expected to cause such problems. *Id.*

The ALJ also found that Ms. Perry *did* have severe impairments: headaches, depression and/or anxiety, and formerly, obesity. (R. 29-32). She was obese when she

filed her 2006 application but no longer was – she weighed 134 pounds and was 5'3". (R. 29). Additionally, the ALJ noted that although Ms. Perry briefly received treatment for hearing impairments, she no longer uses a hearing aid and had no apparent difficult understanding or listening during the hearing. In regard to Ms. Perry's fibromyalgia, the ALJ explained that although she was diagnosed by a rheumatologist in mid-2007, she has not been treated further for the condition, and was discharged from further rheumatology treatment after a few visits. (R. 29-30). Additionally, the ALJ noted that although Ms. Perry has testified that she can sometimes "barely move" her entire left arm, the objective medical evidence does not establish a medically determinable impairment that would be expected to cause such an intermittent impairment. (R. 30).

From the review of the progress notes in the record, the ALJ found that the treating physicians did not indicate the Ms. Perry complained frequently or consistently of severe headaches during the time in question, and further, Ms. Perry acknowledged that she failed to follow-up on referrals to neurologists who could have helped further treat her ailments. *Id.* Additionally, although Ms. Perry did receive a prescription for Depakote to lessen her pain, she had not sought the prescription since she had filed her application. *Id.*

In reference to mental impairments, the ALJ noted that depression is evaluated according to listing 12.04 and anxiety is evaluated per 12.06. *Id.* In order to meet such listings, the medical record must document pervasive symptoms of the impairments, which persist, despite treatment, over at least twelve consecutive months. *Id.* Additionally, the symptoms must markedly affect Ms. Perry's functional capacity throughout the period in question. *Id.* Alternatively, if the mental impairment has endured

for at least two years and has caused repeated extended episodes of decompensation, if work pressures likely would cause decompensation, or if Ms. Perry cannot function outside a highly structured environment, Ms. Perry is disabled. *Id.*

With these criteria in mind, the ALJ noted that Ms. Perry has had little documented or consistent treatment, and she has shown no listing-level functional limitations caused by the impairments. *Id.* In order to show a "marked effect" upon functional capacity, one of the following must be shown: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *Id.*

Through utilizing these criteria, the ALJ noted that Ms. Perry's restrictions on her daily living have been quite mild as she cares for her personal hygiene and grooming with minimal assistance, drives a car, and watches her niece. *Id.* In terms of Ms. Perry's social functioning, the ALJ stated that Ms. Perry lives with her sister's family, and has maintained a close relationship with both or her adult sons, her grandchildren, her adult niece, and her boyfriend. *Id.* In reference to concentration, persistence, and pace, the ALJ noted that Ms. Perry has moderate difficulties, but only for detailed and complex tasks, but not for simple, routine tasks. (R. 32). Specifically, the ALJ noted that Ms. Perry's ability to drive to and from Harvey to pick up her niece suggests good concentration and attention for relatively sustained period. *Id.* Finally, the ALJ found that Ms. Perry has experienced no episodes of decompensation which have been of extended duration. *Id.*

In reference to the findings compiled by the psychologists, the ALJ noted that Ms. Perry's mood and anxiety disorders were not so severe as to meet or medically equal a

17

listed impairment. *Id.* Specifically, the ALJ noted Dr. Hermsmeyer's opinion that Ms. Perry's impairments imposed only mild restrictions on her ability to perform daily activities and moderate limitations in her social functioning and concentration, persistence, or pace. *Id.* Additionally, the ALJ highlighted Dr. Tomassetti's agreement with Dr. Hermsmeyer's prior assessment, and further noted that the record at the time of the hearing suggested that Ms. Perry had better social skills and activities than at the time of the psychologists' reviews. *Id.*

The ALJ found that although Ms. Perry has complained of symptoms of depression and anxiety, the symptoms have not caused more than minimal persistent limitation in her ability to do basic work activities for a documented consecutive 12-month or longer period. *Id.* Further, the ALJ noted that Ms. Perry has had relatively little formal mental health treatment during the relevant time period, and has not taken psychotropic medication since July 2007. *Id.*

After considering the entire record, the ALJ found that the Ms. Perry has the physical RFC to perform a wide range of light work – she can lift, carry, push and/or pull up to twenty pounds occasionally, and up to ten pounds frequently, but she should not do constant repetitive pushing or pulling against resistance with lower extremities. (R. 32-33). Additionally, due to her complaints of poor balance and occasional dizziness, Ms. Perry should never climb ladders, ropes, or scaffolds or work on moving or unstable surfaces, and she should not perform work that would expose her to unprotected heights or unguarded hazardous equipment. (R. 33). Further, the ALJ noted that Ms. Perry can occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl, and that the medical evidence does not establish a medical need for Ms. Perry to use a cane while walking or

18

standing. *Id.*

The ALJ found that Ms. Perry has the mental RFC to perform and sustain simple, repetitive unskilled work. *Id.* The ALJ also noted that Ms. Perry can understand, remember, and carry out instructions and can respond appropriately to supervisors and coworkers in such a setting, although she should not perform work that would require that she interact with the general public. *Id.* Further, the ALJ stated that Ms. Perry could adapt to the type of changes that would be expected in such a setting, and she would be distracted only rarely by symptoms of physical or mental impairments to the extent that she was off-task and not productive. *Id.*

After reflecting upon Ms. Perry's testimony, the ALJ noted that Ms. Perry's presentation during the hearing was quite unusual and dramatic. (R. 43). The ALJ stated that Ms. Perry moved extremely slowly into the hearing room, relying heavily on her cane, and she sat for much of the time during her testimony facing away from her attorney, even though medical records show that Ms. Perry previously used a hearing aid in the left ear. *Id.* Additionally, the ALJ explained that Ms. Perry had no trouble hearing the questions asked of her during the hearing, and only needed questions repeated when she "lost her train of thought." *Id.* The ALJ also noted that Ms. Perry's memory and speed of response to questions varied throughout the hearing – sometimes with long delays, even in response to routine questions about her history. *Id.* Additionally, the ALJ highlighted that Ms. Perry seemed somewhat more comfortable and relaxed after they took a break and provided prompter responses. *Id.*

Ultimately, the ALJ found that Ms. Perry's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but the statements

19

concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the RFC assessment. *Id.* First, the ALJ noted that the objective medical evidence does not well-establish that Ms. Perry suffers from the type of severe physical or emotional problems that would be expected to cause the extreme symptoms she describes. *Id.* Although Ms. Perry refers to her July 2004 "head injury" as the potential cause for her headaches, memory problems, and poor balance, the ALJ's review of the E.R. record did not suggest that the claimant suffered a serious head injury in the accident. *Id.* Additionally, the ALJ pointed out that Ms. Perry was not treated for a traumatic brain injury, and she failed to follow up with subsequent referrals for further evaluation or treatment by a neurologist, even while she had a medical card. *Id.*

Further, the ALJ stated that while a rheumatologist did diagnose Ms. Perry with fibromyalgia syndrome in 2006, the doctor also discharged Ms. Perry from further rheumatology treatment and prescribed tramadol, a medication typically used for moderate pain. (R. 44). Additionally, the ALJ stated that Ms. Perry did not subsequently seek treatment from a rheumatologist or for fibromyalgia, and she has not had prescription-strength pain medication for several years. *Id.* The ALJ also noted that the physical examination findings in the record have not been consistently or persistently abnormal. *Id.* The ALJ explained that some, but not all, examinations stated that Ms. Perry had decreased sensation and/or grip strength, but those findings are not consistent, which led the ALJ to conclude that there is no serious musculoskeletal or neurological abnormality that has caused the complaints. *Id.*

The ALJ also explained that during the hearing, Ms. Perry had several different, inconsistent explanations for why she had not had or sought treatment for her allegedly disabling physical or mental impairments since 2007 – such as lack of a medical card, no funds to pay for treatment, of that she had no source of transportation. *Id.* Additionally, the ALJ noted that Ms. Perry's single E.R. visit made after 2007, in April 2009, did not show that she had complained of the same ailments as she did at the hearing – namely, the extreme pain in all of her joints and her severe emotional problems. *Id.* Further, the ALJ stated that the physical examination findings of that E.R. visit were generally normal, and no medication was prescribed for Ms. Perry. *Id.*

The ALJ found there were some inconsistencies in Ms. Perry's testimony. Ms. Perry claimed that the day before the hearing she had been walking to the store or gas station that is a block or two from her home, but got lost while on the way. *Id.* That didn't jibe with her claim that she could not walk even one-half block and, when she was questioned, Ms. Perry said she actually drove to the store on the day before the hearing, and had not walked. (R. 45). The ALJ also noted that, although Ms. Perry complained of extreme joint pain that affects both her lower and upper body extremities, she was still able to frequently drive a car. *Id.*

Ultimately, given the inconsistencies in Ms. Perry's testimony, and her failure to seek medical treatment for her ailments without credible explanation for the absence of such treatment, and the objective medical evidence, the ALJ gave little credit to Ms. Perry's description of her disabling limitations. *Id.*

Considering Ms. Perry's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy

21

that she can perform. (R. 46). The ALJ noted that if Ms. Perry could perform all or substantially all of the demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon Ms. Perry's specific vocational profile. *Id.* The ALJ stated that Ms. Perry's ability to perform all or substantially all of the requirements of work at the light or sedentary level has been impeded by additional limitations. *Id.* In order to address the extent of these limitations, the ALJ consulted the vocational expert, Mr. Lee Knutson. *Id.* The ALJ explained that Mr. Knutson's response to the hypothetical question that incorporated the limitations established in the specific RFC findings, as well as the credibility findings, noted that there are occupations that exist in significant numbers that the hypothetical worker could perform and sustain. (R. 47). Based on the testimony of the vocational expert, the evidence on the record, Ms. Perry's age, education, work experience, and RFC, the ALJ concluded that Ms. Perry is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and is consequently "not disabled." *Id.*

## IV.
## DISCUSSION

### A.
### Standard Of Review

We review the ALJ's decision directly, but we play an "extremely limited" role. *Simila v. Astrue*, 573 F.3d 503, 513-14 (7th Cir. 2009); *Adams v. Astrue*, 2012 WL 3065299 (N.D. ill. 2012). "We do not actually review whether [the claimant] is disabled, but whether the finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). If it is, the court must affirm the decision.

42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010).

Here, the standard of review is deferential and the court may not reweigh the evidence, make independent credibility determinations, or substitute its judgment for that of the ALJ. *Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Even if reasonable minds may differ as to whether the plaintiff is disabled, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996). However, legal conclusions are not entitled to such deference and, if the ALJ commits an error of law, the decision must be reversed. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Although the ALJ need not address every piece of evidence, the ALJ cannot limit discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 1994). The ALJ must "minimally articulate" the reasons for his ultimate conclusion by building, as the Seventh Circuit calls it, a "logical bridge" between the evidence and the ALJ's conclusion. *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001); *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir.

23

1996).  Substantial evidence may demonstrate that the claimant is not disabled and not entitled to benefits, but if the ALJ fails to provide a path from that evidence to the conclusion, the decision must be remanded.  *Sarchet*, 78 F.3d at 307 (Posner, J.)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

**B.**
**Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1)  is the plaintiff currently unemployed;

2)  does the plaintiff have a severe impairment;

3)  does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4)  is the plaintiff unable to perform his past relevant work; and

5)  is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila*, 573 F.3d at 512-13; *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990).  A negative answer at any point, other than step three, stops the inquiry and leads to a determination that the claimant is not disabled.

24

20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts at step five to the Commissioner, who must then present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy. *Weatherbee*, 649 F.3d at 569-70; *Briscoe*, 425 F.3d at 352.

**C.**

**Analysis**

Ms. Perry advances two arguments for reversal or remand. First, she argues that the ALJ's evaluation of the medical opinions on record was improper since the ALJ did not afford any weight to the medical opinions of the non-examining State agency physicians Arjmand, Bone, Tomassetti, and Hermsmeyer. Second, Ms. Perry argues that the ALJ improperly determined her credibility. *See Plaintiff's Memorandum* at 8-21.

**1.**

Ms. Perry first claims that, although the ALJ summarized the opinions of the state agency physicians, she failed to explain why she accepted or rejected the limitations prescribed by the doctors. *Plaintiff's Memorandum* at 8-9. Specifically, Ms. Perry argues that the in the ALJ's RFC finding, she did not take into consideration Dr. Hermsmeyer's suggestion that Ms. Perry had the mental RFC to perform and sustain simple one and two-step tasks at a consistent pace. *Plaintiff's Memorandum* at 9. Additionally, Ms. Perry notes that the ALJ's RFC finding did not include the limitation of no concentrated exposure to pulmonary irritants as noted in Dr. Arjmand's opinion. *Id.* Further, Ms. Perry claims that the ALJ erred by not including the limitations of Dr. Hermsmeyer and Dr. Arjmand in her hypothetical questions to the vocational expert. *Id.*

25

Ms. Perry relies on *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), which held that an ALJ may not selectively discuss portions of a physician's report that suggests a finding of non-disability while ignoring other portions that suggest a disability. *Plaintiff's Memorandum* at 9-10. She also points to Social Security Ruling 96-6p ("SSR 96-6p"), which states that an ALJ may not ignore the opinions or findings of a State agency, and that the ALJ must explain the weight given to such opinions. SSR 96-6p. Instead of following this approach, Ms. Perry argues that the ALJ found limitations in her RFC that were not present in any medical opinion, such as the finding that Ms. Perry could respond appropriately to supervisors and coworkers, but should not interact with the general public, and the finding that Ms. Perry would only be distracted by symptoms of her physical or mental impairments on rare occasions. *Plaintiff's Memorandum* at 10. Ultimately, Ms. Perry claims that the ALJ reached an improper independent medical determination that was not supported by the record. *Id.*

The residual functional capacity (RFC) assessment is a consideration of the tasks the claimant can physically accomplish in order to determine the level of work that can be performed. 20 C.F.R. § 404.1545(a)(1); *Berger v. Astrue*, 516 F.3d 538, 544 (7th Cir. 2008). When reviewing the ALJ's RFC assessment of the claimant, the reviewing court does not reweigh the evidence or substitute the ALJ's analysis. *Id.*; *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). The ALJ's finding will be affirmed when there is substantial evidence to support that decision. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). The ALJ's decision need not elaborate in intricate detail the evaluation and determination of every item in the record, but only so much as to allow a reviewing court to "trace the path of the ALJ's reasoning." *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.

1996). But, as the plaintiff agues, the ALJ cannot ignore evidence that is contrary to her conclusion.

Although the ALJ did note the physical and mental RFC reports of Dr. Arjmand and Dr. Hermsmeyer within her opinion, she did not provide a thorough analysis of these evaluations. (R.40-41). In reference to the weight afforded to the opinions of Dr. Hermsmeyer and Dr. Tomassetti, the ALJ did note that she would give some weight to the opinions, but then stated that the current record as a whole suggested that Ms. Perry has better social skills and activities than she appeared to have at the time of the psychologists' review. (R. 32). She "modified" the doctors' opinions "based on any changes in [Ms. Perry's] physical or emotional condition since the time of those reviews." Although this may in fact be the case, the ALJ did not point to any specific evidence in the record that would suggest such a bettering of social skills and activities. And the ALJ herself was not allowed to weigh in with her own medical opinion. *Chase v. Astrue*, 458 Fed.Appx. 553, 557 (7th Cir. 2012); *Myles v. Astrue,* 582 F.3d 672, 677 (7th Cir.2009).

Dr. Hermsmeyer found that Ms. Perry would be limited to work that required no more than one- or two-step tasks – Dr. Tomasetti later concurred – but this limitation did not find its way into the ALJ's RFC determination or her hypothetical to the vocational expert. Pursuant to the Dictionary of Occupational Titles (DOT), this translates to reasoning level 1: "apply commonsense understanding to carry out simple one- or two-step instructions . . . ." 1991 WL 688702. Instead, the ALJ limited Ms. Perry to simple, repetitive, unskilled work. The vocational expert identified assembler, hand packager, and inspector/checker/weigher as jobs a person with that restriction could perform. In

the broad category of "assembler," the Dictionary of Occupational Titles list scores of positions, many of which have skill levels at SVP 2 or higher – quite a bit higher in some instances. Such positions require more than a brief demonstration time; perhaps a month for SVP 3 and more beyond that level. The same can be said for packager and inspector. It's unclear from the ALJ's decision how she got from one- or two-step tasks, to a capacity for jobs that, under the DOT, require more.

For the ALJ, it seems that the passage of time remedied the situation. The ALJ stated that the opinions of the State agency physicians were generally consistent and supported by the objective medical and other evidence, but that she had added to or otherwise modified some of the limitations from those opinions based upon any changes in Ms. Perry's physical and emotional condition since the time of those evaluations. (R. 41). It's unclear from the decision what those changes were. Although the Commissioner argues that the ALJ could reasonably find improvement in Ms. Perry's by the time of the hearing due to the length of time that had passed since the doctors performed their evaluations, this is merely speculation. *See* Defendant's Memorandum in Support of Motion for Summary Judgment ("Defendant's Memorandum") at 6. As noted by Ms. Perry, the Commissioner cannot use such post-hoc rationalization to support the ALJ's rejection of a limitation. *See* Plaintiff's Reply to Defendant's Response and Motion for Summary Judgment ("Plaintiff's Reply") at 4, citing *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) (noting "the government's lawyers who defend denials of disability often rely heavily on evidence not so far as appears relied on by the administrative law judge").

The same thing happened with Dr. Arjmand's finding that Ms. Perry could not be exposed to pulmonary irritants. The ALJ did not make it a part of her RFC finding and

28

did not mention it in her hypothetical. And, again, she didn't point to any evidence that Ms. Perry's condition – chronic bronchitis – had changed.

Further, Ms. Perry states that although the ALJ summarized the findings of certain examining physicians, she did not explain the weight that she afforded to these opinions or whether or not she agreed or disagreed with their findings. *Plaintiff's Memorandum* at 12-13. Ms. Perry notes that the failure to fully address these opinions is significant because she may have reached a different RFC finding if she had. *Id.* Additionally, the act of summarizing the evidence is not the equivalent of providing an analysis of the evidence. Under Social Security Ruling 96-8p, "the RFC assessment must include a discussion of why reported symptom-related functional limitations can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* at 3. In other words, the ALJ had to explain why she was disregarding many of the findings – such as positive fibromyalgia tests (R. 401-04), psychomotor retardation and short term memory loss (R. 454, 466), problems with gait and positive Romberg sign (R. 435, 471), hand tremors and decreased grip strength (R. 435, 471), and a number of psychological symptoms resulting in serious impairment of functioning. (R. 442-44, 466-67) – which were confirmed by more than one examining or treating physician. *See Conrad v. Barnhart*, 434 F.3d 987, 991 (7th Cir. 2006) ("medical source opinions must always be considered and addressed by the ALJ in the RFC assessment, and if it conflicts with the ALJ's conclusions then the ALJ must explain why it was not adopted.").

The Commissioner argues that the ALJ did discuss the aforementioned opinions, but did not highlight certain aspects of the evaluations. *Defendant's Motion* at 4-6.

29

Although the Commissioner is correct in that the ALJ did mention all medical opinions, the ALJ failed to fully address and analyze these opinions. As noted in *Diaz v. Charter*, 55 F.3d 300, 307, (7th Cir. 1995),"an ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." Instead of providing such a "path," the ALJ merely stated:

> The physical examination findings have not been consistently or persistently abnormal. On some, but not all, examinations claimant has decreased sensation and/or grip strength, but those findings are not consistent, which suggests that there is no serious musculoskeletal or neurological abnormality that has caused those complaints (R. 44).

With such a statement, the ALJ merely noted the presence of inconsistencies, but failed to explain how the findings were actually inconsistent. Similarly to the ALJ's decision in *Zurawski v. Halter*, here the ALJ's decision leaves us to ponder the specifics of the inconsistencies. 245 F.3d 881, 887 (7th Cir. 2001). Ultimately, the ALJ's failure to provide references to the medical opinions suggests that she made an unqualified medical determination, and consequently, her RFC finding must be questioned.

Due to the lack of proper analysis of the medical evidence, specifically in reference to the ALJ's RFC finding, the required "logical bridge" has not been exhibited. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Without the presence of a logical bridge between the evidence and the ALJ's conclusions in the RFC finding, the ALJ's analysis of the evidence does not provide a rational basis for the denial of benefits. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000), citing *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir.1999).

30

**2.**

Ms. Perry's also argues that the ALJ improperly determined her credibility under Social Security Ruling 96-7p ("SSR 96-7p") is credible. While a remand is required due to the ALJ's treatment of the medical opinions and certain medical findings, some discussion of her credibility assessment is warranted.   Under SSR 96–7p, the ALJ's determination or decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. Additionally, Ms. Perry argues that the ALJ's statements are "precisely the kind of conclusory determination that SSR 96-7 prohibits." *Plaintiff's Memorandum* at 14, citing *Brindisi on Behalf of Brindisi v. Barnhart* 315 F.3d 783, 787 (7th Cir. 2003).

In *Brindisi*, the Seventh Circuit held that post-hoc statements regarding credibility "turn the credibility process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *Brindisi*, 315 F.3d at 787. Specifically, Ms. Perry claims that the ALJ did not follow the proper protocol of SSR 96-7p by first determining Ms. Perry's RFC (R. 32-33), and then later rejecting any statements that did not comport with this finding (R. 43). *Plaintiff's Memorandum* at 15. Ms. Perry also noted that the ALJ's decision contained the type of boilerplate language that the Court has criticized:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent they are inconsistent with the above RFC assessment. R. 43).

In *Bjornson v. Astrue*, 671 F. 3d 640, 645, the Seventh Circuit explicitly condemned the use of such boilerplate language noting:

> One problem with the boilerplate is that the assessment of the claimant's "residual functional capacity"… comes later in the administrative law judge's opinion, not "above"— above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often…depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.

Of course, boilerplate is not toxic; if it were very few plaintiff's briefs in Social Security disability case would survive scrutiny. As long as the ALJ provides reasons for her determination elsewhere in her opinion, all is not lost. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir.2012); *Shideler v. Astrue,* 688 F.3d 306, 312 (7th Cir.2012). Here, the ALJ relied on the objective medical evidence, inconsistencies in Ms. Perry's testimony, and her lack of treatment to find her not credible. The question is whether her reasoning was sound.

It is apparent that the ALJ was most concerned with Ms. Perry's lack of treatment after a certain point. She stated that:

> In a case like this, when there is so little objective evidence to support the claimant's complaints, my evaluation of her credibility is even more important. Overall, given the significant inconsistencies in claimant's testimony (some even during the hearing) and prior reports, her failure to seek medical treatment for those impairments without credible

> explanation for the absence of such treatment, I find that I can give little
> credit to her description of her disabling limitations.

(R. 45).  While a claimant's "'statements may be less credible if the level or frequency of

treatment is inconsistent with the level of complaints', . . .  an ALJ 'must not draw any

inferences about an individual's symptoms and their functional effects from a failure to

seek or pursue regular medical treatment without first considering any explanations that

the individual may provide.'"  *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013)(quoting

SSR 96–7p, 1996 WL 374186, at *7.

Here, the ALJ did explore the reasons Ms. Perry gave up on treatment and she

found those reasons either inconsistent or not credible.  (R. 44-45).  Ms. Perry had a

number of excuses, such as expense, transportation, and the choice to take care of herself

with over-the-counter medication.  When asked why she did not seek free treatment at

Stroger Hospital, she said she called for an appointment but no one called back.  As for

transportation, she claimed her sister would not give her transit fair, but would buy

cigarettes for her.  She also acknowledged that her niece would probably provide her

with transportation.  At another point she explained that she used public transportation to

get around and drove about 25 miles two or three times a week to pick up her niece. (R.

43).  Overall, Ms. Perry's attitude toward seeking treatment can be said to be somewhat

cavalier for someone who is alleging that their condition is so serious that they are

disabled.  Coupling that with inconsistencies in her testimony, it cannot be said that the

ALJ was patently wrong, *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), for not

believing her.

The ALJ's reliance on the objective medical evidence is dicier. As already noted, the ALJ picked and chose the evidence that suited her from the medical record and didn't adequately explain why she discarded certain findings or opinions. A couple of examples were provided earlier, but one more will serve to further illustrate the problem. At one point, the ALJ stated that since Ms. Perry was not treated for a brain injury and she did not follow up with referrals for further evaluation, Ms. Perry did not establish that she suffers from the type of severe physical and emotional problems that she described. *Id.* But, the ALJ did not refer to any of the later scans taken that revealed the presence of the arachnoid cyst. (R. 341, 364, 369). The ALJ also said that there was no objective medical evidence to support the existence of debilitating right arm pain. (R. 30). At the same time, the ALJ did acknowledge that Ms. Perry's diagnosis of fibromyalgia was confirmed by all 18 tender points. (R. 29). The ALJ didn't explain why the two were not linked. By failing to reference the specific evidence that supported her finding, the ALJ did not comport with the requirements of SSR 96-7p that "the reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *See* SSR 96-7p; *Mueller v. Colvin*, 2013 WL 1701053, 3 (7th Cir. 2013)(ALJ's credibility determination could not stand where he merely recited medical records and did not explain how they were inconsistent with claimant's allegations).

Additionally, in regard to Ms. Perry's fibromyalgia and her lack of treatment since 2007, the Commissioner notes that the ALJ's credibility finding was proper since Ms. Perry only had one follow-up appointment with the rheumatologist at The University of Chicago, and she also failed to seek significant treatment despite referrals and advice

from her family that she see a doctor. *Defendant's Motion* at 9-10. Once again, the Commissioner's argument here is not persuasive since the ALJ did not support her conclusions with specific evidence. Instead of providing the necessary analysis, the ALJ simply concluded that due to the inconsistencies in the physical examination findings, there is no serious musculoskeletal or neurological abnormality that has caused Ms. Perry's complaints. (R. 44). The lack of specific evidence and analysis directly contradicts *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), which stated that the court cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions in the record, fails to logically bridge the facts of the case and the outcome.

So the ALJ's reasons for finding Ms. Perry not credible were a mixed bag of the valid and the flawed. That would not necessarily require a remand. An ALJ's credibility finding does not have to be perfect, and it may stand if she provides at least some valid reasons for it that are supported by the record. *See Kittelson v. Astrue*, 362 Fed.Appx. 553, 558 (7th Cir. 2010)(although one of ALJ's reasons was faulty, "he specified another, valid reason for finding [claimant] not credible. . . ."). But, again, the ALJ's lack of analysis of portions of medical records does.

**CONCLUSION**

The plaintiff's motion for remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 5/14/13